at this time of motion for argument. So that would be United States v. Ho-Wan Kwok. All right, Mr. Kwok, whenever you're ready. May it please the Court, good morning, Your Honors. This Court has said that bail should be denied only in a rare case of extreme and unusual circumstances. And this is an extreme and unusual case, but not for the reasons that justify pretrial detention. The dollar amount at issue in the case is high. The purported wealth of the defendant, he's purported to be very wealthy, and this case does involve a foreign national with ties abroad. All of those facts can be found in many cases that have come before this Court where bail has been approved and the defendants have made their appearances. This case is extreme and unusual because of factors that actually work against the suggestion that Mr. Kwok is a flight risk. He is a global leader of a Chinese pro-democracy movement. He has been subjected to an unprecedented level of attack from the only other global superpower, state-sponsored electronic hacking, surveillance, disruption of his activities, physical surveillance here in the United States, harassment by foreign operatives who come to his home and threaten him unless he returns to China. The high-level penetration of our government, even within the Department of Justice, where people were acting as unregistered foreign agents in order to secure our client's deportation to China. Personal threats and attacks, a red notice based on trumped-up charges, a state-sponsored global disinformation campaign designed to discredit, smirch, bankrupt, innumerable lawsuits filed against our client by CCP, Chinese Communist Party agents, and a documented effort to urge the CCP agents in the United States to call on U.S. law enforcement to take prompt action against Mr. Kwok. That comes from an FBI affidavit filed in the Eastern District of New York. And how does that, though, weigh into the calculation of whether or not, the factors that relate to whether or not someone's a risk either of flight or of harm to the community or obstruction? Like, there's these issues that you've just mentioned. How do they, what about those factors suggests that the district court was wrong in making these findings about the risks? Well, first of all, it doesn't appear the district court considered any of that. And the reason why the court should have considered that is because all of these factors go to whether or not he is a flight risk, and in particular, a flight risk abroad, which has been the focus of the government's allegations. So is your argument that at the threshold question of 3142 F, is it F2, that of even triggering the possibility of a detention hearing is where the flaw is, and or in the consideration of the factors, right? Because in order to, and given the nature of the charges, in order to even consider detention, the court has to find either a serious risk of flight or a serious risk, essentially, of obstruction or tampering. Is your argument that at that threshold question of whether detention could even be considered, the court erred, or that the balancing of the factors was an error, or both? The balancing of the factors primarily, both, Your Honor. But my focus today is on the latter. Okay. And the reason for that is each of these factors, each of these elements, the personal circumstances of the defendant compel him to remain in the United States. Were he to leave, were he to subject himself to either extradition from the UAE, as the government has suggested he would abscond to, or anywhere else, he would leave the umbrella of protection, limited umbrella of protection that the U.S. has provided, abandon his asylum claim, and abandon his wife and his daughter who reside here, and also abandon his son who lives in the U.K. because he couldn't go there. They have an extradition relationship with the United States. But these factors were never considered, at least they don't appear to have been considered by the district court. Well, the district court, though, did consider the family issue, the fact of his wife and daughter being here, and in fact noted that his son is in England, and so that was considered by the district court. Yes, but not in the context of the threats he faces from China and why that would compel him to stay here where his wife and his daughter are also asylee applicants. So that nuance is missing from the district court's opinion. 3142E requires that the judicial officer find no condition or combination of conditions will assure the person's appearance in court. The district court did not conduct that assessment. At least it's not clear that it did in the order. Instead, the district court examined only our bail proposal, and of that, only a portion of it. And the portion that it did consider, it dismissed without any substantive analysis at all or very little. The court stated, the district court, that no condition or set of conditions would ensure the defendant's return to court or the safety of the community. Parroting that language is not enough. Instead of explaining why or how that is the case, the court follows that sentence with defendant's bail package is insufficient. And it's insufficient because we hadn't proposed our sureties yet. And the court speculated that we couldn't come up with any sureties that would satisfy the requirements that in our proposal, that they be vetted by the government and that they meet the court and the government's approval. We were never even given that opportunity, but the court concluded we couldn't do that. And the fact that we hadn't yet presented them should be a basis to deny bail. But wasn't the district court more focused on just the general issue of the extraordinary resources and connections? And that that's part of, seemed to be a big part of what the district court was relying on. That combined with the evidence suggesting obstructive behavior even after he was under investigation. Yes, Your Honor. I'm going to, Judge Lange, I'm going to talk about that right now. They, the court found the past behavior of the defendant troubling and these obstruction orders from the bankruptcy court troubling. There's no question about that. The problem here is that we fashioned a bail proposal that did not require Mr. Clock's willingness to abide by court orders. Now, the government said in its papers all the conditions we proposed require his willingness. That's not true. We took into account that concern. We proposed GPS monitoring combined with home detention, combined with severe electronic restrictions such that he could have no communication with anyone but his lawyers, and 24-7 surveillance by guards. But those guards, would they be empowered? I mean, I probably had, I probably sat in on some different table in the room, I don't know, thousands of bail hearings. And at the end of the day, it is impossible to have a release on bail that doesn't rely on a defendant's compliance. Because by definition, when you are not detained, at some level the defendant has freedom. So even in, no matter how high the level of private security, unless those private security officers are somehow authorized by the government to use force to detain him, which I don't anticipate was going to be the case, or that bracelet is the first I've ever seen that wasn't capable of being cut off, at the end of the day, there is still the requirement that the defendant willingly comply. The only measure that stops that is physical restraint. So I don't understand how you can say that this, these conditions did not require any voluntary compliance by Mr. Clock. Well, we started with our bail package with, under the premise that he would comply with those conditions for various reasons, such as the threat he faces if he were to flee. The other requirements, GPS, home detention, as the Court recognized with regard to guards, it's not the same as a Federal detention facility. Of course not. But these combined together, along with the other requirements and assurities, are sufficient. And in case, such as the Subhani case, where you had a very similarly situated defendant with extensive ties abroad, tens of millions of dollars of money abroad, the ability to flee, family members overseas, and very little connection to the U.S., the Court found that that was an extreme case, but that the proposal, which mirrors closely what we're proposing, was extreme as well, and was adequate to address those issues. So no, it's not a perfect solution, and detention would be as close to perfection as you can get, but that's not what's required, is perfection. I was picking up on your claim that the Court improperly relied on this idea that voluntary compliance by the defendant was relevant. You made a comment that there was no need for voluntary or willing compliance, and that's what I was responding to. And I'm sorry if I overstated, Judge Miriam. My point is that we considered both his compliance, willingness to comply with some of our package, and the fact that there's concerns that he won't, and this is a supplementary condition, such as guards, et cetera. None of that was adequately distressed by the district court as to why that would not be sufficient. And given the need for supplemental information, it sounds like you're saying, look, the district court didn't give us a chance to fully flesh out our proposal here in terms of identifying the sureties and things like that. It's not uncommon that we see postponements of bail hearings or repeated resubmissions of proposals and packages. Isn't that still available to you and your client? Well, that doesn't appear to be available based on the language of the order where the Court said it could not only do we not propose sureties, but it could not imagine any circumstance in which it can. Well, but it doesn't have to imagine if you give them to the Court. Well, that's true, Your Honor, but the language of the order seemed dispositive and necessary to seek this Court's relief and ask the district court to reconsider that sort of absolute bar to us finding any surety that would meet those requirements. Has a trial date been set? No, Your Honor. We have a status conference next week. Have you asked for an early date? We asked for trial this fall, which is exceptionally soon given the volume of evidence. The government has asked for trial next spring, 2024. May it please the Court. My name is Ryan Finkel for the United States. I'm an assistant United States attorney in the Southern District of New York, and I represent the United States in this appeal, as I did in the district court below. Judge Torres did not err, let alone clearly err, when determining that Kwok presents a serious risk of flight, a serious risk of obstruction, and a danger to the community. Nor is there error in Judge Torres' conclusion that there are no set of conditions which should ensure the safety of the community. Kwok claims that the Court did not take into consideration sort of speculative and theoretical possibilities and restrictions on bail. That's not right. Judge Torres did. And what Judge Torres did do was look at Kwok's actions, Kwok's activities in other litigations, including decisions published by a State Supreme Court judge in New York State, Judge Ostreicher, and a Federal bankruptcy court judge, Judge Manning. I'm sorry, just to jump in for a second. Did the Court consider the issue of the fact that there was no flight for, I guess, some period of time, a year perhaps, after he knew he was under investigation, that during that time he remained in the United States? Was that considered by the Court so far as you can tell? It was, Your Honor. In fact, Judge Torres said, and this is, I believe, page 7 of her opinion, the defendant, I'm quoting, the defendant engaged in extensive international travel after leaving China in 2015 prior to filing his application for asylum in the United States. And Judge Torres concluded that when he remained in the United States, her words, it is more likely than not that the pendency of defendant's asylum application prevented him from traveling internationally between 2017 and the present. Rather than his fear of persecution. Right. No, no. I'm not speaking so much to persecution. I'm talking about flight in terms of avoiding these charges from the time that he knew he was under investigation, and I don't know what the year was when that became known, that there was no attempt at that point, when there was a threat of criminal action, there was no attempt to leave the United States. Judge Torres definitely considered those arguments, because those arguments were featured by counsel at the oral argument before Judge Torres and in their papers. So those arguments were certainly considered by Judge Torres. And what Judge Torres considered is, to the extent, well, among other things, but to the extent those facts suggest that Kwok wasn't going to flee the United States, the government obviously has a different view, but just taking that arguendo, it also shows how much of a danger Kwok was, because he was essentially undeterrable. And these considerations, these conclusions that Judge Torres reached, the question — Danger to do what? To continue the fraud. Can he do that from jail just as well? Well, Your Honor, I respectfully submit that if Kwok can continue to commit the fraud while in jail, then the proper place for him is to be detained, because he certainly could commit the fraud when he is released. And there is no doubt, Your Honor, I submit, that being detained in a Federal system would — Well, but danger usually means he'll assault somebody. I don't know that we've ever approved detention because he will fraud somebody. Have we? So this Court has, Your Honor, looked at economic harm. And I would — I would submit to the Court, and Judge Torres considered both of these things, that danger arises from Kwok in two ways. One is that, despite his knowledge that the SEC had issued an — he continued to do it. Despite the fact that the government had seized some of his financing, he continued to defraud. In fact, Your Honor, in fact — Well, I'm not disputing — I'm not egracing with you the issue of whether he will defraud, only whether that's a good reason to lock him up. So, Your Honor, the — this Court has considered economic harm, possible economic harm, as a danger. And beyond the possible economic harm, Your Honor, there's also the harm of obstruction. And that is significant here because, unlike I would submit typical cases or many cases, and Judge Torres considered this, as I mentioned, other judges have found his obstructive behavior and issued opinions about that obstructive behavior. And just to give an example, Your Honor, Judge Manning, the Federal Bankruptcy Court judge, on November 23, 2022, issued a TRO enjoining Kwok from essentially harassing, including protesting outside. Some of the protests became quite physical outside Paul Hastings' offices and O'Melveny Myers' offices. These are individuals who are basically involved in civil litigation against Kwok, and enjoined him from this behavior. Days later, Kwok issued a statement in a broadcast when talking about the court-appointed bankruptcy trustee. To deal with this rogue, meaning the trustee — and I'm quoting his words, Kwok's words — we have our rogue's ways. In a few days, you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities. Fomenting this sort of unrest, Your Honor, I submit respectfully, is dangerous. And indeed, other protested activity that Kwok has supported has resulted in physical violence undertaken at the hands of agents. And this Court, in the Oriana case, has indicated that courts can consider whether someone works through agents, works as a principal directing others sort of as a crew to either obstruct court proceedings or cause violence or cause danger or help with flight. Then, Your Honor, it goes even further. Judge Manning ultimately issued a preliminary injunction enjoining preliminarily Kwok from further activities. And two days after that order, just two days after that order, Kwok again posted on his social media outlets encouraging his followers to file frivolous claims on the bankruptcy court docket, essentially flooding the docket to do nothing else than obstruct the proceedings in the bankruptcy court. Do you want to say a word about the around-the-clock guarding? Certainly, Your Honor. So this Court has been quite skeptical of private security arrangements. In the Banky case, this Court said, and I'm quoting, it is not legal error for a district court to decline to accept such a condition of release as a substitute for detention. And in the Oriana case, private jails at best elaborately replicate a detention facility without the confidence of security that such a facility instills. And in Bousanti, this Court has expressly held that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails. And there's a reason that the private jail security doesn't work, and this was featured during my adversary's arguments. The incentive structure is different for private security than it is in a Federal detention facility. Private security, as proposed here, would be paid for by clock, which means they'd be answerable to him. It would also indicate that private security would have an incentive to ensure that maybe things aren't reported to the judge every little bit, every instance as they should be. And why is that? Because private security wants to get paid as they continue to police the defending. But I also submit, frankly, if the only way for a defendant, and this is consistent with the case law that I just cited, I believe, if the only way for the defendant to be released, for the community to be safe, for him not to flee, is to be surrounded by 24-7 private security, then he should be detained. And, Your Honor, the standard of review here, I want to close with this, I think is important. The question is not whether this Court would reach a different conclusion than what Judge Torres did. The question is whether Judge Torres' conclusion on the face of the full record was not plausible, that Judge Torres committed a mistake. And Judge Torres did not. Judge Torres considered the arguments, the arguments that counsel has raised here, and reached a conclusion that was different. She reached a conclusion that clock has the ability to obtain passports. Do you want to say anything about your reported preference for a trial date a year ahead? So, Your Honor, we'll see where exactly Judge Torres wants to schedule trial. The government is not opposed to a sooner trial date. As counsel mentioned, there is a lot of discovery here, and we assume that the I take it your view of an early date might change depending upon whether he was at liberty. So, Your Honor, I think with respect to the decision before the Court, as I mentioned, it's a question of whether there was clear error by Judge Torres. And separate and apart from that, in terms of the trial date, Judge Torres will make that decision. Part of it will be when she can schedule a three-, four-, five-week trial. I don't know what her court calendar is. The government is not opposed to a sooner date, but believes that some time will be necessary for the parties, particularly the defense, to review discovery. Judge Torres orders an earlier date. The government will be ready. The government will be ready. Because the evidence here, as Judge Torres found, is very strong, based on bank records and documents. And just one point on that, Your Honor, the defense claims that Judge Torres didn't subject the government to some sort of exacting scrutiny. Taking a step back, Judge Torres listened to the government's proffer, which is appropriate. But Judge Torres's opinion itself cites underlying evidence, cites statements that Klock himself made, not from the government's briefing, but on his social media pages. So did Judge Torres do what was required of a district court judge? Did she analyze the evidence before her and reach a conclusion that is plausible in the face of all the evidence? Absolutely. And this Court should affirm. All right. Thank you. Judge Torres was required to consider all possible alternatives to preventative detention and, quote, to explain on the record the extent to which it considered any alternatives, and if so, on what basis they were rejected. Judge Torres did not do that. Judge Torres did not even consider all of our proposals, much less the possible proposals that could potentially secure Mr. Klock's. But your package was before her. It was before her. So are we to assume she didn't read it? I don't know. No, I presume that she read it, Your Honor. When you come up with a detailed package, does she have to take each item and say, each one is not enough, nor in combination are they enough? Yes, Your Honor. She has to say that. Absolutely. She can't look at your package and say, not enough. Correct. She can't do that. Have you made that clear on a detailed package? To explain on the record the extent to which the court considered any alternatives, and if so, on what basis they were rejected. I can understand that if someone comes in and says, Judge, we want bail, and we think a $10,000 bond is enough, and the judge doesn't say anything, just says, do not. Right. That's a pretty thin record. Correct. But when you sort of meet yourself going a little bit, I mean, I understand, I'm not faulting you, but I understand. You want to give her the best possible package to avoid detention, and with some judges that might be persuasive. But when it isn't, can you then fault the judge for saying, well, I've looked at your seven-point package, and it isn't enough? Well, Judge Newman, the Berrios v. Berrios, this court's decision, says the judge must also state on the record on what basis they were rejected. And in this case, there was no statement on the record on what basis our proposals were rejected. And, indeed, how is it that the concerns raised by the government are not satisfied by an absolute bar on all electronic communications, home detention, under supervision? That is extreme requirements, necessary to match what they claim is an extreme risk, and we believe that was sufficient. And the court clearly erred in not even identifying why that was not sufficient, clearly on the record. On that, I submit. Thank you, Your Honors. Thank you. We'll take it under advisement.